Cite as 2025 Ark. App. 410

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CR-24-579

| | |
|---|---|
| MATTHEW DENNIS<br><br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br><br>APPELLEE | Opinion Delivered September 10, 2025<br><br>APPEAL FROM THE LONOKE COUNTY CIRCUIT COURT<br>[NO. 43CR-23-363]<br><br>HONORABLE BARBARA ELMORE, JUDGE<br><br>AFFIRMED |

## N. MARK KLAPPENBACH, Chief Judge

Matthew Dennis appeals his conviction for second-degree sexual assault of a minor female. Appellant contends that there is insufficient evidence that he was "a guardian, a temporary caretaker, or a person in a position of trust or authority over the minor." We affirm.

When a circuit court denies a defendant's motion for directed verdict, we will affirm if there is substantial evidence, either direct or circumstantial, to support the verdict. *Harvey v. State*, 2024 Ark. App. 576, 700 S.W.3d 904. Substantial evidence is defined as evidence forceful enough to compel a conclusion one way or the other beyond suspicion and conjecture. *Id.* The evidence is viewed in the light most favorable to the verdict, and only evidence supporting the verdict is considered. *Id.*

As charged here, a person commits second-degree sexual assault if the person engages in sexual contact with a minor and is a guardian, a temporary caretaker, or in a position of trust or authority over the minor. Ark. Code Ann. § 5-14-125(a)(4)(A)(iv) (Supp. 2023). Matthew does not challenge the State's proof that he had sexual contact with the minor (MC). Instead, Matthew maintains that the State failed to present sufficient evidence that he was in the special category of persons to have had this sexual contact.

The jury was instructed that "temporary caretaker" means a person, usually not a parent, who has and exercises custodial responsibility for a child for a limited, usually short, period of time. The statutory threshold of "position of trust or authority" is met when a relationship raises a strong inference of trust and supervision and when the appellant's function in the relationship could be characterized, at a minimum, as that of a chaperone. *Harvey*, *supra*.

The relevant evidence at trial, considering only the evidence supporting the jury's guilty verdict, is as follows. MC's family fell on hard times during the COVID pandemic and accepted Matthew's offer to provide them with housing. MC's mother had been close friends with Matthew. Matthew was in his forties. The family (MC's mother, father, sister, and MC) moved into Matthew's home. Matthew's father used the one available bedroom. Matthew, his sister, and everyone else slept in the living room: MC's mother and father slept on a mattress on the floor; MC's sister slept on a separate mattress on the floor; Matthew's sister slept in a recliner; and Matthew and MC slept on an L-shaped sofa, each taking one

2

section. After a few months, MC's mother and father moved into a nearby trailer on Matthew's property.

MC's mother viewed Matthew as a caregiver for her daughters. MC was homeschooled, so she did not have friends her own age. Matthew made sure MC got up in the morning, and because he had internet in his house, he made sure MC got her schoolwork done while MC's parents were at work. MC and her family viewed Matthew as an uncle figure. MC called him "Uncle Matt." Matthew taught MC how to drive a stick shift, a backhoe, and a mini-bulldozer; they would frequently "hang out" together.

MC said that after they had been living in Matthew's house for about a month, at night he began rubbing her genitals through her clothes. MC was fourteen years old. She did not yell out or alert the others in the room because she "froze." She said she did not want to be the reason her family lost their housing. MC said this happened two to three times a week for the year and a half she stayed in the house with Matthew. She said his behavior escalated after her parents moved into the nearby trailer; MC would awaken to Matthew biting at her vaginal area through her clothes. Matthew had told MC that he wanted to marry her and that he would wait on her. One time, she was taking a nap in Matthew's house, and she awoke to Matthew's putting his hand under her underwear and inserting a finger inside her. After MC moved into the trailer with her parents, she still went to Matthew's house to do her schoolwork because she needed internet access.

Matthew told MC's father and another coworker that he would marry MC and have kids with her, which was very concerning to MC's father. Eventually, MC told her mother

3

what Matthew had been doing to her. They reported this to the police. The family moved out of Matthew's property because the parents did not believe MC was safe around Matthew.

Matthew admitted in an interview that he had inappropriate feelings for MC, which made him feel like a pedophile, and that he had inappropriate sexual contact with her at least eleven times. He said he was in love with a sixteen-year-old girl. On this evidence, the jury found Matthew guilty.

We hold that there was sufficient evidence that he was a "guardian, a temporary caretaker, or in a position of trust or authority" over MC. Matthew was not a stranger to the victim; rather, he was "Uncle Matt" and a friend to MC's whole family. He taught her to drive, and they would "hang out" together. Their relationship raised a strong inference of trust and supervision. Matthew's function in their relationship could be characterized, at minimum, as that of a babysitter or chaperone, particularly when MC stayed at his home while her parents were not there. MC's parents trusted Matthew to provide care and supervision of MC. This evidence clearly meets the definition of the class of persons listed in the statute. *See Nelson v. State*, 2011 Ark. 429, 384 S.W.3d 534; *Bowker v. State*, 363 Ark. 345, 214 S.W.3d 243 (2005).

Affirmed.

HARRISON and HIXSON, JJ., agree.

*Law Office of Omar F. Greene*, by: *Omar F. Greene*, for appellant.

*Tim Griffin*, Att'y Gen., by: *James Hill*, Ass't Att'y Gen., for appellee.

4